**IN THE UNITED STATES DISTRICT COURT
IN THE SOUTHERN DISTRICT OF ALABAMA
SELMA DIVISION**

|  |  |
|---|---|
| **JOY MCCANTS,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) **Civil Action No.** |
| **EQUIFAX INFORMATION SERVICES LLC** and **21st MORTGAGE CORPORATION,** | ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

### PRELIMINARY STATEMENT

1. This is an action for damages brought by an individual consumer, Joy McCants ("Plaintiff"), against Defendants Equifax Information Services LLC ("Equifax") and 21st Mortgage Corporation (21st Mortgage) (collectively, "Defendants") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq*. as amended.

2. Defendant Equifax is a national consumer reporting agency ("CRA") and has been selling credit reports inaccurately marking Plaintiff as deceased. When Equifax inaccurately reports a living consumer as deceased it makes it practically impossible for that consumer to access credit, as they did with Ms. McCants. Equifax's practice also harms the businesses that purchase its reports; as such, companies cannot process credit applications due to the applicant's lack of a credit score. There is no good faith rationale to explain Equifax's practice other than the generation of revenue. If the Defendant actually believed that Ms. McCants was deceased, it had no legally

permissible basis to sell her reports. If Equifax believed Ms. McCants was alive, it knowingly sold her reports with a gross inaccuracy. Moreover, Equifax knows that identity thieves use the credit information of truly deceased persons to commit credit fraud. Equifax thus violated Plaintiff's rights under the Fair Credit Reporting Act ("FCRA"), as set forth below.

## PARTIES

3. Plaintiff Joy McCants is an adult individual who resides in Grove Hill, AL.

4. Defendant Equifax is a consumer reporting agency that regularly conducts business in the Northern District of Alabama, and which has a principal place of business located at 1500 Peachtree St., NW, Atlanta, GA 30309.

5. Defendant 21st Mortgage is a business entity that regularly conducts business in the Northern District of Alabama, and which has a principal place of business located at 620 Market St. Knoxville, TN 37902.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

7. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### *Equifax Practices Concerning the Sale of Reports on the "Deceased"*

8. Equifax is regulated as a "consumer reporting agency" ("CRA") under the FCRA. 15 U.S.C. § 1681a(e).

9. Equifax sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores. 15 U.S.C. § 1681a(e).

10. Pursuant to the FCRA, Equifax must follow procedures which assure that the reports it sells meets the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

11. Pursuant to the FCRA, Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) and 1681b.

12. Equifax places a "deceased" notation or marking on reports when it is advised from any of its many data furnishing sources that a given consumer is deceased.

13. The furnishing sources identify a "deceased" consumer by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

14. Equifax does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

15. Equifax does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

16. Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

17. A deceased notation is a very unusual marking upon a credit file or credit report.

18. In some cases, in order to assure accuracy, Equifax sends letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed its Equifax credit file, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. But Equifax has no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Equifax to be placed in said consumer's credit file or report.

19. Equifax regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Equifax does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased, via a furnishing source, is also on the Death Master File before it sells a credit report about said consumer, or at any time.

20. Equifax will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

21. Indeed, Equifax employs no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

22. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Equifax employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

23. Even in instances where the purportedly deceased consumer communicates directly with Equifax, Equifax employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

24. Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

25. Nevertheless, Equifax routinely sells to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

26. Upon Equifax's reports with a "deceased" mark sold to third parties, Equifax never calculates or provides a credit score for that consumer.

27. Equifax knows that many third-party credit issuers require a credit score in order to process a given credit application.

28. Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

29. Equifax knows that living consumers are turned down for credit specifically because Equifax is reporting them as "deceased" and without a credit score.

30. Equifax has been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Equifax is reporting them as "deceased" and without a credit score.

31. Equifax has received and documented thousands of disputes from consumers complaining that their Equifax credit reports have them erroneously marked as "deceased."

32. Equifax knows that thousands of consumers are erroneously marked as "deceased" on their Equifax credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

33. Nevertheless, Equifax employs no procedures which assure that a consumer marked as "deceased" on Equifax's reports are, in fact, deceased.

34. Even consumers who dispute the erroneous "deceased" status on their Equifax credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

35. Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

36. Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

37. For years after a consumer's actual death, Equifax will continue to sell credit reports about that consumer.

38. Equifax will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy those reports.

39. Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

40. Equifax profits from the sale of reports on the deceased.

41. Equifax has in its credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

42. Equifax knows that truly deceased consumers do not apply for credit.

43. Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal

identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

44. Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

45. Equifax warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

46. Equifax has no similar death certificate, executorship paper, or any other proof requirements for its data sources which report a consumer as deceased or for the buyers of its reports which access the purportedly deceased consumer's information.

47. Indeed, Equifax sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

48. For consumers who are deceased, there exists no permissible purpose under the FCRA for Equifax to ever sell its credit reports, absent a court order.

49. Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### *Case Specific Facts*

50. For a period of time since at least November 2020, Equifax has marked Plaintiff as "deceased" on her Equifax credit reports; specifically, the deceased mark appears on Plaintiff's 21st Mortgage account (hereinafter the "inaccurate information").

51. Plaintiff is not deceased.

52. Equifax did not calculate or provide any credit score for or on Plaintiff, even though it sold reports about her to third parties marking her as "deceased."

53. Equifax has been reporting the deceased notation through the issuance of false and inaccurate consumer credit reports that it has disseminated to various persons and credit grantors, both known and unknown.

54. Plaintiff's credit reports and file have been obtained from Equifax and have been reviewed many times by prospective and existing credit grantors and extenders of credit, and the deceased notation has been a substantial factor in precluding Plaintiff from receiving many different credit offers and opportunities, known and unknown.

55. Plaintiff was denied for a personal loan, an auto loan and auto insurance, as well as being denied other credit offers and opportunities and suffered credit defamation, in whole or in part because Equifax sold a credit report marking Plaintiff as deceased.

56. Plaintiff disputed the deceased notation with Equifax by following it's established procedures for disputing consumer credit information.

57. Plaintiff has disputed the deceased notation with Equifax from November 2020 through the present.

58. Notwithstanding Plaintiff's efforts, Equifax has sent Plaintiff correspondence indicating its intent to continue publishing the inaccurate information and Equifax continues to publish and disseminate such inaccurate information to other third parties, persons, entities and credit grantors. Equifax has repeatedly published and disseminated consumer reports to such third parties from at least November 2020 through the present.

59.     Despite Plaintiff's efforts, Equifax has never: (1) contacted Plaintiff to follow up on, verify and/or elicit more specific information about Plaintiff's disputes; (2) contacted all third parties that would have relevant information concerning Plaintiff's disputes; (3) forwarded any relevant information concerning Plaintiff's disputes to the entities originally furnishing the inaccurate information; (4) requested or obtained any credit applications, or other relevant documents from the entities furnishing the inaccurate information; or (5) performed any handwriting analysis.

60.     In addition, 21st Mortgage, the furnisher of the inaccurate information, has also failed to conduct timely and reasonable investigations of Plaintiff's disputes after being contacted by the relevant credit reporting agencies concerning Plaintiff's disputes and has willfully continued to report such inaccurate information to various credit reporting agencies and did not properly mark the account as disputed.

61.     Despite Plaintiff's exhaustive efforts to date, Defendants have nonetheless deliberately, willfully, intentionally, recklessly and negligently repeatedly failed to perform reasonable investigations/reinvestigations of the above disputes as required by the FCRA, have failed to remove the inaccurate information, and have continued to report the inaccurate information about Plaintiff.

62.     As a result of Defendants' conduct, Plaintiff has suffered actual damages in the form of lost loan and credit opportunities, credit defamation and emotional distress, including anxiety, frustration, embarrassment and humiliation.

63.     At all times pertinent hereto, Defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

64. At all times pertinent hereto, the conduct of Defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## COUNT I – EQUIFAX
## VIOLATIONS OF THE FCRA

65. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

66. At all times pertinent hereto, Equifax was a "person" and "consumer reporting agency" as those terms are defined by 15 U.S.C. §§ 1681a(b) and (f).

67. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

68. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d),

69. Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, Equifax is liable to Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. §§ 1681e(b) and 1681i.

70. The conduct of Equifax was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to Plaintiff that are outlined more fully above and, as a result, Equifax is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## COUNT II – 21ST MORTGAGE
## VIOLATIONS OF THE FCRA

71. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

72. At all times pertinent hereto 21st Mortgage was a "person" as that term defined by 15 U.S.C. § 1681a(b).

73. 21st Mortgage violated sections 1681n and 1681o of the FCRA by willfully and negligently failing to comply with the requirements imposed on furnishers of information pursuant to 15 U.S.C. § 1681s-2(b).

74. 21 Mortgage's conduct was a direct and proximate cause, as well as a substantial factor, in causing the serious injuries, damages and harm to the Plaintiff that are outlined more fully above, and as a result 21 Mortgage's is liable to compensate Plaintiff for the full amount of statutory, actual and punitive damages, along with attorneys' fees and costs, as well as such other relief, permitted by law.

## JURY TRIAL DEMAND

75. Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendants, based on the following requested relief:

    (a)    Actual damages;

    (b)    Statutory damages;

    (c)    Punitive damages;

    (d)    Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o; and

(e)    Such other and further relief as may be necessary, just and proper.

Respectfully Submitted,

*/s/ Micah S. Adkins*
Micah S. Adkins
ASB-8639-148A
**THE ADKINS FIRM, P.C.**
1025 Westhaven Boulevard, Suite 220
Franklin, Tennessee 37064
MicahAdkins@ItsYourCreditReport.com
T: (615) 370-9659
F: (615) 370-4099

Alexis I. Lehmann, Esq.
(*pro hac vice* motion forthcoming)
FRANCIS & MAILMAN, P.C.
1600 Market Street, suite 2510
Philadelphia, PA 19103
P: (215) 735-8600
F: (215) 940-8000
alehmann@consumerlawfirm.com

*Attorneys for Plaintiff*